Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged contracting of and disability from the alleged occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act and the employer-employee relationship existed between plaintiff and defendant.
2. Defendant is self-insured. At the time in question in this case, Kemper was the risk manager.
3. Commission Form 18, marked as plaintiffs Exhibit 1, is admitted into evidence as a document filed with the Commission on the date reflected by the date stamp shown on the copy contained in the Commissions file. This form is admitted into evidence for the purpose of showing it was filed with the Commission and not as evidence of the matters stated herein.
4. At all times relevant to this claim, the employer-employee relationship existed between plaintiff and defendant.
5. Plaintiffs average weekly wage was $602.48 which yields a compensation rate of $401.65.
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 40 years old at the time of the hearing before the Deputy Commissioner. He began working for defendant on 15 October 1973 and continued to work for defendant at the time of the hearing before the Deputy Commissioner.
2. Plaintiff has a history of knee problems. He suffered an injury to his right knee when he was a child, and injured his left knee in early 1974 while playing softball. Plaintiff underwent surgery on his left knee to repair torn ligaments and meniscus. In October 1975, plaintiff complained of knee pain. In March 1976 he complained of swelling and itching on the left knee. In May 1976, plaintiff reported knee pain as a result of squatting while working on a car and as a result of going up and down steps. In 1977, plaintiff sprained his knee while playing volleyball. In September 1981, plaintiffs knee gave way, causing him to fall and seek treatment from a chiropractor. However, from 1982 until 1990, plaintiff experienced no major problems with his knees and was fully able to do his job, including all of the squatting and kneeling. In 1988 a medical examination disclosed no problems with plaintiffs knees and documented that no further joint problems had occurred.
3. After being hired, plaintiff drove a lift truck and worked in the warehouse until January 1975, when he was laid off for four months. When he returned to work, he became a staple operator in staple finishing where he worked for two years. In 1977, plaintiff became a first-floor ETF spinning operator, working primarily as a doffer for the next six years in a position that required him to squat or kneel occasionally in order to perform the functions of the job. Defendants workers and supervisors confirmed, and the Full Commission finds as a fact, that these jobs required the employee to squat or crouch approximately 32 times per shift, or every fifteen minutes, and to hold that position for between 30 to 60 seconds.
4. In 1982, plaintiff was transferred to the first floor DTFY area, where he continued to work as a spinning operator. In 1983 plaintiff transferred to staple spinning where he worked for approximately five years. The majority of this time was spent on the second floor. In 1988, plaintiff returned to the ETF spinning operator position.
5. Plaintiff was placed on light duty from 25 April 1991 following complaints of knee pain. Plaintiff presented to Dr. Charles Classen on May 1, 1991. Upon examining plaintiff, Dr. Classen concluded that plaintiff had an internal derangement of both knees with a probable torn meniscus in the right knee. On 22 May 1991, plaintiff had right knee surgery performed by Dr. Classen. On 8 July, Dr. Classen performed left knee surgery. Dr. Classen found that plaintiff had a flap tear, posterior one-third, lateral meniscus, chondromalacia, and an old torn anterior cruciate ligament.
6. On 13 November 1991, plaintiff asked Dr. Classen whether he could squat or doff. Dr. Classen noted that "with his knees there is no way he can do a job where he had to squat more than very occasionally. Defendant transferred plaintiff to the staple spinning section to work as a spinning patrol operator.
7. Plaintiff was transferred to staple finishing in March 1992. Plaintiff began to have trouble with the constant standing and stair-climbing required by the new position, and inquired about other assignments to accommodate his knee condition. Defendants medical personnel recommended re-evaluation by an orthopedist and possible physical therapy.
8. On 19 August 1992, Dr. Stephanie Griffin, to whom plaintiff was referred, concluded that he was suffering from osteoarthritis.
9. Dr. Christopher M. Barsanti evaluated plaintiff on 1 December 1992, and found degenerative changes in both knees. Dr. Barsanti gave plaintiff work restrictions of no stooping, squatting, kneeling, stair climbing, or pushing or pulling heavy objects.
10. After receiving notice of these restriction, defendant notified plaintiff that he would be paid for 30 days and then terminated because of his knee conditions. Plaintiff responded by asking the defendants medical department whether he could continue working by rotating between "DTF duties and the cut/bail section and even to pack. He also advised the medical department that he did not believe that Dr. Barsanti understood his job duties. Defendants medical department called Dr. Barsanti to describe each assignment in the staple operator job and to obtain his opinion about plaintiffs returning to work. In a letter dated 15 January 1993, written at plaintiffs request, Dr. Barsanti advised that plaintiff should be able to do the required tasks, but that he could not engage in prolonged standing, stooping, or climbing. With the readjusted work restrictions, plaintiff was able to continue with the cut/bale assignment in staple spinning from January 1993 through February 1995. On 1 February 1995, plaintiff became a draw machine operator.
11. After an examination of plaintiff on 9 March 1995, Dr. Classen noted that plaintiff felt pulling in both knees and was complaining of his knees giving way and aggravation upon climbing. Dr. Classen concluded that plaintiff was suffering bilateral degenerative joint disease with a cruciate deficient knee on the left. He gave plaintiff a 7% permanent partial impairment rating of the right leg and a 42% permanent partial impairment rating of the left leg.
12. On 1 April 1996, Dr. George Edwards, Sr., an orthopedic surgeon, examined and evaluated plaintiff. Dr. Edwards diagnosed plaintiff as suffering chondromalacia and traumatic arthritis in both knees. He concluded that prolonged squatting was definitely detrimental to plaintiffs knees and aggravated his pre-existing problems. He further stated that plaintiffs job put him at an increased risk over that of the general public for developing knee problems. However, Dr. Edwards defined prolonged squatting as maintaining a full squat position for at least ten minutes. Plaintiff never told Dr. Edwards how long he squatted at his job, and Dr. Edwards never went to the plant to view plaintiffs job. His opinion relied upon viewing edited tapes of the position which focused on squatting. For these reasons, Dr. Edwards opinion regarding the increased risk factor in plaintiffs position is given little weight.
13. Dr. Maxwell R. Kasselt visited defendants plant and observed persons performing the jobs held by plaintiff. He also reviewed plaintiffs medical records. Dr. Kasselt stated that in general, the doffers position did not place an employee at a greater risk of developing knee problems than that faced by the general public. He noted that squatting is a basic movement which is performed in everyday life. Specifically, he testified that plaintiffs job did not place him at a greater risk than the general public of developing knee problems, and that given plaintiffs pre-existing condition, he would have developed the same problems regardless of his employment. Greater weight is given to the opinion testimony on increased risk of Dr. Kasselt as compared to that of Dr. Edwards.
14. Nancy Stewart, a rehabilitation counselor and vocational rehabilitation expert, spent approximately twelve hours at the plant site observing the performance of jobs and interviewing workers and section leaders. In the first floor ETF job, she observed frequent stooping, defined as "bending at the waist to reach downward and forward, occasional kneeling, and only negligible crouching, defined as "bending the legs and knees to work at a low position close to the floor. In the first floor DTFY job, she again observed frequent stooping and occasional kneeling, and crouching rose to the category of occasional. Finally, in both the second floor ETF and DTFY jobs, she found kneeling and stooping to be occasional, and crouching to be negligible. With the exception of the frequent stooping requirement in the first floor jobs, Ms. Stewart found that the movements required by plaintiffs jobs was within the range of the majority category of jobs in the general population.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish the existence of an occupational disease compensable under N.C. Gen. Stat. 97-53(13), the disease must be: (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the employment. Rutledge v. Tultex Co.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
2. The greater weight of the medical evidence in this case, coupled with the testimony of Nancy Stewart and co-employees of plaintiff, fail to establish that plaintiffs job placed him at a increased risk over that faced by the general public in developing chondromalacia and traumatic arthritis in his knees. Accordingly, plaintiff has not suffered from an occupational disease as defined by the Act. N.C. Gen. Stat. 97-53.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiffs claim for compensation based on contracting an occupational disease must be denied.
2. The parties shall divide the costs of this action.
This the ___ day of March, 2000.
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
S/ ______________________ RENÉE C. RIGGSBEE COMMISSIONER